DISCIPLINARY COUNSEL *v.* BUNSTINE.

[Cite as *Disciplinary Counsel v. Bunstine,*

131 Ohio St.3d 302, 2012-Ohio-977.]

*Attorneys—Misconduct—Violations of Rules of Professional Conduct, including*
*engaging in conduct prejudicial to the administration of justice—Six-*
*month suspension stayed on condition.*

(No. 2011-0647—Submitted September 20, 2011—Decided March 13, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and

Discipline of the Supreme Court, No. 10-065.

_____

**Per Curiam**.

**{¶ 1}** Respondent, Edward Royal Bunstine, of Chillicothe, Ohio,
Attorney Registration No. 0030127, was admitted to the practice of law in Ohio in
1981. In August 2010, relator, disciplinary counsel, filed a complaint against
respondent, alleging that his actions in a criminal investigation involving
acquaintances violated Prof.Cond.R. 8.4(c) (a lawyer shall not engage in conduct
involving dishonesty, fraud, deceit, or misrepresentation), 8.4(d) (a lawyer shall
not engage in conduct that is prejudicial to the administration of justice), and
8.4(h) (a lawyer shall not engage in conduct that adversely reflects on the fitness
to practice law).

**{¶ 2}** A panel of the Board of Commissioners on Grievances and
Discipline heard the matter. It concluded that respondent had violated
Prof.Cond.R. 8.4(d) and (h), but not 8.4(c), and recommended that the charge be
dismissed. The panel further recommended that respondent be publicly
reprimanded for his misconduct.

**{¶ 3}** The board adopted most of the panel's report but found that respondent had also violated Prof.Cond.R. 8.4(c). As a result, the board recommended a six-month suspension from the practice of law in Ohio. Respondent filed objections to the board's report.

**{¶ 4}** After considering the arguments presented in the briefs and in oral argument, we accept the board's findings of professional misconduct and the recommendation for a six-month suspension; however, we order a stay of all six months of the suspension.

### Misconduct

**{¶ 5}** The actions giving rise to the complaint began with a disagreement between two families. Russell Creed was a long-time friend of Ed DeLong and his wife, Bonnie DeLong. At various times over the years, all three had taken Schedule II or III analgesics prescribed by their physicians, and they would occasionally give each other this medication if one of them was in need but unable to get to a pharmacy right away to fill or renew a prescription.

**{¶ 6}** On September 17, 2007, Ed DeLong discovered that some of his pain medication was missing. After Bonnie denied taking the pills, he accused Russell Creed of taking them. When contacted, Russell confirmed that he had taken some of the medication, and he immediately went to the DeLongs to return it. Convinced that Russell had not returned the full amount, Ed threatened to contact law enforcement. Russell's wife, Natalie, in turn, threatened to file charges against Bonnie for having given Russell pills in the past.

**{¶ 7}** Respondent received a frantic phone call at home from Natalie Creed, who reported that employees of the Ross County Sheriff's Department had visited his home. Respondent knew the Creeds and the DeLongs socially. Respondent told Natalie that he would talk to the DeLongs to "see what [he] could find out about the situation."

2

**{¶ 8}** When respondent contacted the DeLongs, both expressed misgivings about having called the sheriff's office, fearing that they may have gotten Russell into real trouble. Rather than suggest that the DeLongs contact the sheriff's office directly and withdraw the accusation against Russell, respondent agreed to prepare affidavits for the couple to sign. According to Bonnie DeLong,[1] she assumed that respondent was preparing the documents as a friendly favor, and no fee was ever discussed or a bill for services ever received. She denied that the couple ever considered respondent to be their legal representative in the matter.

**{¶ 9}** The affidavits stated that Russell and Bonnie had exchanged prescription medication in the past and articulated the DeLongs' current belief that Russell had simply "borrowed" some medication as he had done before. Both affidavits indicated that the DeLongs had asked respondent to prepare the documents and deliver them to the sheriff's office. Ed and Bonnie DeLong signed these statements on September 19.

**{¶ 10}** On September 20, Detective David Bower of the Ross County Sheriff's Department met with respondent. Bower told him that Ed DeLong had contacted the sheriff's department concerning his affidavit, and Bower indicated that respondent may have done something wrong. When Bower asked respondent for the affidavits, respondent refused, claiming that he had an attorney-client relationship with the DeLongs that prevented him from surrendering the documents.

**{¶ 11}** Bower threatened respondent with arrest, prompting respondent's agreement to release the documents if the DeLongs' consent was obtained. Consent was obtained and the affidavits were surrendered. Respondent drafted a second affidavit that Bonnie signed on October 1, 2007. It stated in part:

---

1. Ed DeLong is since deceased and did not testify in the disciplinary proceeding.

It was acknowledged and agreed that Mr. Bunstine would not release the Affidavits to anyone without our authorization. Further, we authorized Mr. Bunstine to destroy the Affidavits if he felt that this would be in the best interest of me and my husband.

Mr. Bunstine advised both me and my husband that he would protect our interest and that the Affidavits could not, and would not, be released or the contents divulged if the Affidavits would place a negative light against my husband and I.

{¶ 12} The focus of the sheriff's investigation gradually shifted from Russell Creed to respondent and the affidavits that he had created. While the investigation failed to prove that anything in the original affidavits was false, it nevertheless culminated in respondent's no-contest plea to two counts of disorderly conduct, which arose from the assertions that he made to the sheriff's office regarding the affidavits.

{¶ 13} Respondent's conduct after the affidavits were created is the focus of this disciplinary proceeding. Respondent has asserted that all of his actions were consistent either with the DeLongs' wishes or his duty to them as their attorney. Relator has accused respondent of fabricating an attorney-client relationship with the DeLongs and argues that respondent's refusal to surrender the affidavits was motivated solely by his desire to shield himself from potential criminal charges in connection with those documents.

{¶ 14} The board found that the evidence did not support respondent's claims, and we agree. There is no evidence that the DeLongs retained respondent as their legal representative. Bonnie DeLong testified that she and her husband did not understand that respondent was acting as their attorney, and no fee agreement or other contract between respondent and the DeLongs was ever produced. Respondent persists, arguing that the preparation of the affidavits

implicitly gave rise to an attorney-client relationship. Even if that statement is true, however, his refusal to surrender the affidavits ignores that (1) the documents were prepared specifically for the sheriff, (2) the documents contained the DeLongs' express consent to their release, and (3) respondent went to the sheriff's office for the express purpose of giving those documents to a department representative.

{¶ 15} The evidence also does not support respondent's contention that he was only heeding the DeLongs' instructions in attempting to retain the affidavits. Respondent cites Bonnie's October 1, 2007 affidavit, which states that respondent was to keep and destroy the original affidavits if he believed that they contained information that was detrimental to the DeLongs. Respondent, however, knew that Bonnie's admission to sharing scheduled medication could subject her to prosecution, yet he included that admission in the original affidavits and took them to the sheriff's office—actions utterly inconsistent with his purported instructions. The October affidavit is nothing more than a belated fabrication of instructions made for the sole purpose of trying to justify respondent's actions.

{¶ 16} The board was also troubled by respondent's admission that he received $1,000 from Russell Creed after charges against Creed had been dropped. Respondent waited eight months before reporting this money to the authorities investigating him, and he did so only after learning that Creed had told them of the payment. These actions, coupled with his preparation of affidavits that arguably exonerated Creed at Bonnie DeLong's expense, prompted the board's concern that respondent may have actually been representing Russell Creed.

{¶ 17} We agree with the board that respondent's actions violated Prof.Cond.R. 8.4(d) and (h). We also agree with the board's determination that respondent's actions violated Prof.Cond.R. 8.4(c)'s prohibition against dishonesty, fraud, deceit, or misrepresentation. Respondent insists that such a

finding is inappropriate since the board found no evidence that the September affidavits contained untrue statements. Respondent's focus, however, is too narrow. Regardless of the truthfulness of the affidavits, much of respondent's testimony about his actions after the affidavits were prepared cannot be reconciled with the actions themselves and are a deliberate misrepresentation of what actually occurred in this case.

**Sanction**

{¶ 18} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. We also weigh evidence of the mitigating and aggravating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 19} The board found two mitigating factors: (1) the absence of a prior disciplinary record and (2) the imposition of other penalties or sanctions by virtue of his negotiated misdemeanor no-contest plea. *See* BCGD Proc.Reg. 10(B)(2)(a) and (f). It also found two aggravating factors, concluding that respondent acted with a selfish motive and that he refused to acknowledge the wrongful nature of his conduct. *See* BCGD Proc.Reg. 10(B)(1)(b) and (g).

{¶ 20} Respondent objects to both aggravating factors, but again we agree with the board. His continued insistence that his actions were motivated by a desire to protect the DeLongs, not himself, is not supported by the evidence. Respondent's attempts to retain the September affidavits were clearly intended to protect himself, not the DeLongs. Moreover, his preparation of Bonnie DeLong's second affidavit—which contradicts much of what she had averred in her first one—was clearly intended to extricate respondent from the situation he found himself in after he had refused to surrender the initial affidavits. We thus agree that BCGD Proc.Reg. 10(B)(1)(b) is an aggravating factor in this case.

6

**{¶ 21}** We reach the same conclusion regarding BCGD Proc.Reg. 10(B)(1)(g). Respondent's contention that *if* he did anything wrong, he accepts responsibility for it, does not constitute an acknowledgement that he *did* act inappropriately.

**{¶ 22}** Generally, a violation of Prof.Cond.R. 8.4(c) warrants an actual suspension from the practice of law. *Disciplinary Counsel v. Potter*, 126 Ohio St.3d 50, 2010-Ohio-2521, 930 N.E.2d 307, ¶ 10. There are, however, exceptions in which we have stayed the suspension on the condition that the respondent commit no further disciplinary violations.

**{¶ 23}** In *Disciplinary Counsel v. Ricketts*, 128 Ohio St.3d 271, 2010-Ohio-6240, 943 N.E.2d 981, we imposed a six-month stayed suspension on an attorney who had misrepresented the encumbered status of land in order to deceive creditors. Despite a finding that respondent had violated DR 1-102(A)(4), the predecessor of Prof.Cond.R. 8.4(c), we imposed the stayed suspension, writing:

> Although we find that respondent intended to make misrepresentations that could mislead others, we do not think that he did so in a malicious or selfish manner. Respondent honestly wanted to fulfill the wife's wish to pay all creditors fully, and he believed that everyone would be paid if he could discourage creditors from seeking the company's unencumbered assets. Everyone did get paid in this instance, and there was no showing that anyone was harmed by the misrepresentations.
>
> The presence of this laudable motive does not excuse his behavior or prevent us from sanctioning him; the methods used by respondent in this matter could easily have been used for more malicious ends and to cause greater harm. It does, however, make

us believe that this is a one-time ethical lapse by an attorney with an otherwise sterling reputation that does not merit an actual suspension from the practice of law.

*Ricketts* at ¶ 41-42.

{¶ 24} The case at bar is distinguishable from *Ricketts* in that respondent acted with a selfish motive. On the other hand, there were no misrepresentations in the documents that gave rise to this controversy, unlike in *Ricketts*. Thus, on balance, we find *Ricketts* to be instructive.

{¶ 25} We also believe that as in *Ricketts*, a laudable intent did, at one point, exist. Respondent's decision to become involved in the Creed-DeLong matter appeared to stem from a sincere desire to resolve a matter between four individuals that he knew to be longtime friends. Unfortunately, baseless accusations about the veracity of the affidavits that he had prepared suddenly subjected respondent to scrutiny that he had never anticipated. As respondent stated later, he wishes that he had never taken Natalie Creed's phone call.

{¶ 26} Respondent's arguably good intentions, however, do not excuse his subsequent behavior or prevent the imposition of a sanction. When respondent learned that Ed DeLong had made accusations about the truthfulness of the affidavits that respondent had prepared, respondent attempted to shield these documents from inspection by suggesting that he had an attorney-client relationship with the DeLongs that, even if present, would not have prevented him from releasing the affidavits. Respondent then created a second affidavit for Bonnie's signature to support the assertion that he could not release the affidavits without the DeLongs' consent. Such misconduct requires more than a public reprimand.

{¶ 27} Respondent has practiced law in the state of Ohio for 30 years without any prior disciplinary record. As in *Ricketts*, we believe that this was a

one-time ethical lapse that is unlikely to be repeated, and thus it does not merit an actual suspension from the practice of law. Therefore, we suspend respondent from the practice of law in Ohio for six months, but we stay all six months on the condition that respondent commit no further disciplinary violations. If respondent violates this condition, the stay will be lifted, and respondent will serve the six-month suspension. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, LUNDBERG STRATTON, O'DONNELL, and CUPP, JJ., concur.

O'CONNOR, C.J., and LANZINGER and MCGEE BROWN, JJ., dissent and would impose a six-month actual suspension.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Heather Coglianese, Assistant Disciplinary Counsel, for relator.

Edward R. Bunstine, pro se.

_____